IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| BRUCE L. DAVIDSON, M.D., a single person, | ) ) ) | No. 80062-1-I |
| Appellant, | ) ) | |
| v. | ) ) | |
| ROBB W. GLENNY, M.D., individually, and SHAWN J. SKERRETT, M.D., individually, | ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) ) | |

VERELLEN, J. — Government officials may be shielded from individual liability by absolute privilege when a compelling need shows immunity is required to properly carry out the duties they have the authority to fulfill. The limited record at this stage of the proceedings shows Dr. Robb Glenny and Dr. Shawn Skerrett had authority to make only recommendations about reappointing Dr. Bruce Davidson. They had no authority to act, so no compelling need supports an absolute privilege. No Washington case has conferred an absolute privilege upon a government employee with such limited authority.

Although RCW 28B.10.648 confers a conditional statutory immunity upon individual faculty members who participate in peer reviews in good faith, Davidson

alleges his former colleagues acted in bad faith. Davidson alleged facts sufficient to survive a motion for judgment on the pleadings.

Therefore, we reverse the trial court's judgment on the pleadings in favor of Drs. Glenny and Skerrett.

## FACTS

As alleged,[1] the University of Washington (UW) School of Medicine chose not to renew the annual appointment of Dr. Bruce Davidson, a long-time volunteer clinical professor at Harborview Medical Center, following a faculty meeting to discuss reappointments. During that meeting, Dr. Robb Glenny and Dr. Shawn Skerrett told the faculty about allegations against Davidson of poor patient care and violations of professional boundaries even though they knew the allegations had been investigated and determined to be unfounded. The faculty chose not to renew Davidson's appointment because of their statements. Davidson sued Glenny and Skerrett for defamation, false light, and negligence. Glenny and Skerrett moved for judgment on the pleadings and attached portions of the UW Faculty Code as well as their biographies from the university's website. The court considered the motion, including the attached materials, concluded Glenny and

---

[1] Because this appeal is from a CR 12(c) motion for judgment on the pleadings, all facts are taken from Davidson's complaint, except where otherwise noted. When reviewing a dismissal granted under CR 12(c), facts alleged in the complaint are assumed to be true. Washington Trucking Ass'n v. State Emp't Sec. Dep't, 188 Wn.2d 198, 207, 393 P.3d 761 (2017) (citing FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 180 Wn.2d 954, 962, 331 P.3d 29 (2014); P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 211, 289 P.3d 638 (2012)).

Skerrett were shielded by an absolute privilege, and dismissed Davidson's complaint.

Davidson appeals.

ANALYSIS

As a threshold matter, Davidson contends the court erred by considering materials outside the pleadings.

Generally, when considering a CR 12(c) motion for judgment on the pleadings, a trial court may consider only the factual allegations contained in the complaint.[2]  But when a complaint alleges the contents of documents and does not attach them to the complaint, a court may consider those documents as well.[3]  Because Davidson's complaint quotes at length from the UW Faculty Code, albeit without quotation marks,[4] the court could consider it.  And although the complaint does not refer to the website biographies of either Glenny or Skerrett, Davidson conceded to the trial court that any consideration of their biographies was

---

[2] LaRose v. King County, 8 Wn. App. 2d 90, 103, 437 P.3d 701 (2019) (citing Jackson v. Quality Loan Serv. Corp. of Wash., 186 Wn. App. 838, 844, 347 P.3d 487 (2015)); see Washington Trucking, 188 Wn.2d at 207 ("'We treat a CR 12(c) motion . . . identically to a CR 12(b)(6) motion.'") (alternation in original) (quoting P.E. Sys., 176 Wn.2d at 203).

[3] McAfee v. Select Portfolio Servicing, Inc., 193 Wn. App. 220, 226, 370 P.3d 25 (2016) (citing Rodriguez v. Loudeye Corp., 144 Wn. App. 709, 726, 189 P.3d 168 (2008)).

[4] Compare Clerk's Papers (CP) at 8 (complaint) with CP at 36 (UW Faculty Code).

harmless.[5]  Davidson does not show he was prejudiced by the court's consideration of either the UW Faculty Code or the respondents' biographies.

We review a CR 12(c) dismissal de novo.[6]  At this stage, a court should dismiss a complaint "'only when it appears beyond doubt' that the plaintiff cannot prove any set of facts that 'would justify recovery.'"[7]  We review the existence of a privilege de novo as a question of law.[8]

Davidson argues the court erred by concluding Glenny and Skerrett possessed an absolute common law privilege shielding their communications during the faculty meeting discussing his reappointment.  The trial court relied solely on their possession of an absolute privilege to dismiss Davidson's complaint.  No one argued and the trial court did not address any statutory immunity.  Glenny and Skerrett contend they were shielded by absolute privilege as supervisors evaluating Davidson's work.[9]

---

[5] See CP at 107 (noting in his motion for the court to not consider the documents that "Defendants' biographies do little more than confirm their status as inferior state officers.").

[6] Washington Trucking, 188 Wn.2d at 207 (citing FutureSelect, 180 Wn.2d at 962; P.E. Sys., 176 Wn.2d at 203).

[7] Id. (quoting San Juan County v. No New Gas Tax, 160 Wn.2d 141, 164, 157 P.3d 831 (2007); P.E. Sys., 176 Wn.2d at 210).

[8] Liberty Bank of Seattle, Inc. v. Henderson, 75 Wn. App. 546, 563, 878 P.2d 1259 (1994) (citing RESTATEMENT (SECOND) OF TORTS § 619(1) cmt. a).

[9] See Resp't's Br. at 11-13 (arguing absolute privilege applies because respondents were fulfilling evaluative duties).

First, we consider the common law absolute privilege. An absolute privilege can shield a government official from any liability.[10] The "extraordinary breadth of an absolute privilege" limits it to "cases in which the public service and administration of justice" require it.[11] The privilege exists for pragmatic reasons: if government officials feared their acts could expose them to civil suits, even if the acts were authorized by law, "[i]t would seriously cripple the proper and effective administration of public affairs as [e]ntrusted to the executive branch of government."[12] This pragmatic need is balanced against an individual's right to be free of defamatory attacks.[13] An official's rank alone does not decide whether their acts are shielded by absolute privilege.[14]

> It is not the title of his office but the duties with which the particular
> officer sought to be made to respond in damages is entrusted—the
> relation of the act complained of to 'matters committed by law to his
> control or supervision,'—which must provide the guide in delineating

---

[10] Bender v. City of Seattle, 99 Wn.2d 582, 600, 664 P.2d 492 (1983) (citing McNeal v. Allen, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980); Gold Seal Chinchillas, Inc. v. State, 69 Wn.2d 828, 830, 420 P.2d 698 (1966)).

[11] Id.

[12] Spalding v. Vilas, 161 U.S. 483, 498, 16 S. Ct. 631, 637, 40 L. Ed. 780 (1896).

[13] Liberty Bank, 75 Wn. App. at 566-67 (citing Engelmohr v. Bache, 66 Wn.2d 103, 104, 401 P.2d 346 (1965)).

[14] See Barr v. Matteo, 360 U.S. 564, 572-73, 79 S. Ct. 1335, 3 L. Ed. 2d 1434 (1959) (reasoning absolute privilege can extend to "officers of lower rank in the executive hierarchy"); see also Liberty Bank, 75 Wn. App. at 564 (noting "'[a] good number of States . . . have extended the absolute privilege to state officers of various ranks below that of cabinet level" (alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 591 cmt. c)).

the scope of the rule which clothes the official acts of the executive officer with immunity from civil defamation suits.[15]

A defendant advocating for an absolute privilege must first establish they had the authority to carry out the allegedly injurious acts.[16] Next, the defendant must show there is a compelling public policy justification for an absolute privilege by balancing the scope of the official's authority, the pragmatic need for the official's acts to be shielded, and the plaintiff's right to be free from injury.[17]

Glenny and Skerrett argue statutes governing UW and the UW Faculty Code confer hiring authority upon them as members of the UW faculty. RCW 28B.20.130(2) grants the Board of Regents authority to employ "members of the faculty, and employees of the institution, who . . . shall hold their positions during the pleasure of said board of regents." Glenny and Skerrett do not show any statute directly conferring authority upon UW clinical or teaching faculty to make employment decisions regarding other faculty.[18] Although RCW 28B.10.528

---

[15] Barr, 360 U.S. at 573-74 (quoting Spalding, 161 U.S. at 498).

[16] See Spalding, 161 U.S. at 499 ("But if [an official] acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages.").

[17] See Bender, 99 Wn.2d at 600 ("some compelling public policy justification" is necessary to justify an absolute privilege); Twelker v. Shannon & Wilson, Inc., 88 Wn.2d 473, 479, 564 P.2d 1131 (1977) (citing Ward v. Painters' Local Union 300, 41 Wn.2d 859, 252 P.2d 253 (1953)) (defendant has the burden of establishing existence of a privilege).

[18] Glenny and Skerrett argue RCW 28B.20.200 granted them authority to make employment decisions, but that statute is silent about hiring. RCW 28B.20.200 grants faculty authority only for "immediate government of the institution under such rules as may be proscribed by the board of regents." The statute authorizes self-governance decisions by UW faculty only to the extent allowed by the UW Board of Regents.

grants the Board of Regents the ability to delegate its authority, Glenny and Skerrett fail to show it delegated hiring authority to them through the UW Faculty Code.

Section 24-51 of the Faculty Code provides "[t]he President and the appropriate college or school faculty share responsibility for <u>recommending</u> faculty appointments to the Regents," so "[t]he appropriate faculty, therefore, . . . shall provide the Regents, through the President, with the information needed for a wise decision."[19]  Section 24-53 of the Faculty Code explains the procedure for renewal of nontenure faculty appointments:

> A.  The voting members of the appropriate department . . . shall decide whether to <u>recommend</u> renewal or termination of the appointment. . . . The voting faculty of an academic unit may, by majority vote, delegate authority to recommend the renewal of affiliate or clinical faculty. . . .
>
> . . . .
>
> B.  If this <u>recommendation</u> is a departmental one, the chair shall transmit it to the dean.  If the chair does not concur in the recommendation he or she may also submit a separate recommendation.[20]

The Board of Regents retained its statutory authority to make actual hiring decisions and did not delegate it to teaching and clinical faculty.[21]  Because an

---

[19] CP at 78 (emphasis added).

[20] CP at 79-80 (emphasis added).

[21] We note Glenny and Skerrett agree that faculty committees make only reappointment recommendations, which do not become decisions "until they get to the [Board of] Regents."  July 22, 2020 oral argument, 15:00-15:20, http://www.courts.wa.gov/content/OralArgAudio/a01/20200722/2.%20Davidson%20v.%20Glenny%20%20%20800621.mp3.

absolute privilege depends upon a government official acting within their authority,[22] and Glenny and Skerrett fail to show they had authority to act, they are outside the scope of government employees whose acts may be shielded by an absolute privilege.[23]

Even if making a recommendation was an exercise of authority, Glenny and Skerrett do not show a compelling public policy justification for expanding the scope of absolute privilege.[24] Historically, an absolute privilege has been extended to three general areas: (1) judicial proceedings, (2) legislative proceedings, and (3) acts of state by important government officials.[25] Here, we are not concerned with judicial or legislative proceedings. The history of the doctrine regarding executive officials illustrates its limited scope.

---

[22] Spalding, 161 U.S. at 498-99.

[23] Glenny and Skerrett cite Oda v. State, 111 Wn. App. 79, 100-01, 44 P.3d 8 (2002), to illustrate that hiring and retention are "carried out primarily at the departmental level." Resp't's Br. at 2. But Oda cuts against their position because it too notes UW faculty make hiring recommendations only, and the university is not bound by them. See 111 Wn. App. at 101 (noting a UW provost accepts hiring "recommendation[s] from the local faculty level in more than 95 percent of cases"). Their reliance on section 28-32 in the Faculty Code is also misplaced. That section allows a faculty member aggrieved by an "injustice" to petition for review of a decision by "any persons acting on behalf of the University in an administrative capacity and affecting" employment. CP at 36. Glenny and Skerrett could act on UW's behalf by evaluating Davidson even though they lacked the authority to retain him.

[24] See Bender, 99 Wn.2d at 600 (a compelling public policy justification is necessary for an absolute privilege to apply).

[25] Engelmohr, 66 Wn.2d at 104-05.

Spalding v. Vilas, a federal Supreme Court decision from 1896, was the earliest case conferring an absolute privilege on an executive branch official.[26] An attorney filed claims against the Postmaster General, who was then a Cabinet officer, for lost business and harm to his reputation.[27] The attorney alleged he was injured by a letter sent by the Postmaster General to thousands of postal employees regarding pay raises granted by an act of Congress.[28] The Court concluded an absolute privilege shielded the Postmaster General's communication.[29] Because he had the duty to implement the pay raise, "he was entitled to express his opinion" about the law's purpose and function "and to indicate what, in his judgment, was necessary" for postal employees to receive their increased pay.[30] The Court limited this protection to "action having more or less connection with the general matters committed by law to his control or supervision."[31]

In the 1959 case of Barr v. Matteo, the Court considered whether absolute privilege protected an appointed executive branch official below the cabinet level.[32]

---

[26] 161 U.S. 482, 493, 16 S. Ct. 631, 40 L. Ed. 780 (1896) (noting whether an executive branch officer is shielded by absolute privilege "has not . . . been the subject of judicial determination")

[27] Id. at 484.

[28] Id. at 485-86

[29] Id. at 498.

[30] Id. at 491.

[31] Id. at 498.

[32] 360 U.S. 564, 565, 79 S. Ct. 1335, 3 L. Ed. 2d 1434 (1959).

Two former employees of the Office of Rent Stabilization sued its acting director for defamation after he distributed a press release naming them and stating they were terminated for approving a plan that "violated the spirit of the" law.[33] The plan had been unpopular in Congress and the press.[34] The Court concluded the acting head enjoyed an absolute privilege against liability from the press release.[35] Because the acting director had been delegated statutory duties, he had the discretion to publicly address matters that had been discussed in Congress and the press relating directly to his duties.[36]

Seven years later, in Gold Seal Chinchillas, Inc. v. State, our Supreme Court considered whether absolute privilege shielded "the Attorney General and his staff" from liability for an allegedly defamatory press release.[37] Staff members from the Consumer Protection Division of the Attorney General's Office (AGO) filed a complaint against chinchilla farmers for violating the Consumer Protection Act,[38] and that same day, distributed a press release naming the defendants and quoting from the complaint.[39] The chinchilla farmers sued for defamation. Citing Spalding, the court determined that for an absolute privilege to apply, the allegedly

---

[33] Id. at 567 n.5.

[34] Id. at 566-67.

[35] Id. at 574.

[36] Id. at 574-75.

[37] 69 Wn.2d 828, 829-30, 420 P.2d 698 (1966).

[38] Ch. 19.86 RCW.

[39] Gold Seal, 69 Wn.2d at 829.

injurious statement must "have some relation to the general matters committed by law to the control or supervision of the particular state official."[40]  Because the attorney general had a statutory duty to enforce the Consumer Protection Act and an implied duty as an elected official to inform the public of his conduct, an absolute privilege shielded these acts.[41]  And because the attorney general carried out these duties through AGO employees, the attorney general's absolute privilege extended to the conduct of those employees.[42]

No Washington decision has held every employee in the executive branch is shielded by absolute privilege whenever they act within their authority.  The Gold Seal court held the elected, cabinet-level attorney general and his staff were shielded by absolute privilege when fulfilling the attorney general's duties.[43]  In Stidham v. State Department of Licensing, the court concluded statements and acts by two political appointees, the director and assistant director of the Department of Licensing, could not be the basis for liability because both were shielded by an absolute privilege.[44]  And in Liberty Bank of Seattle, Inc. v.

---

[40] Id. at 834 (citing Spalding, 161 U.S. at 498).

[41] Id. at 833-34.

[42] Id. at 834 ("[S]tate officials, acting through the members of their staffs, are absolutely privileged with respect to the content of their oral pronouncements or written publications.").

[43] Id.

[44] 30 Wn. App. 611, 615, 637 P.2d 970 (1981); see RCW 43.24.016(1) (granting the director authority to "supervise and administer" the department and to "advise the governor and legislature" about the department); RCW 43.24.016(2)(c) (empowering the director of the Department of Licensing to appoint assistant directors and exempting the assistant director from the state civil service law, chapter 41.06 RCW).

11

Henderson, this court concluded an appointed state banking official and a lower-level statutory appointee acting on the official's behalf had absolute immunity against a defamation claim.[45]

An official's rank alone does not decide whether their conduct is shielded by absolute privilege.[46] But a higher-ranking official will more likely need an absolute privilege to exercise their discretion when acting within the scope of their wide-ranging statutory duties.[47] Glenny and Skerrett are ordinary government employees, not appointed or elected officials, and do not show they had important public policy matters within their control or supervision. Even accepting their contentions about hiring, they had limited authority over a few people to decide a routine matter.[48] They allegedly defamed Davidson when participating in a meeting before a departmental vote.[49] Even if the vote had important practical implications, their votes were only two out of all those cast. Although the director

---

[45] 75 Wn. App. 546, 567, 878 P.2d 1259 (1994).

[46] See Barr, 360 U.S. at 572-73 (reasoning absolute privilege can extend to "officers of lower rank in the executive hierarchy"); see also Liberty Bank, 75 Wn. App. at 564 (noting "'[a] good number of the [s]tates . . . have extended the absolute privilege to state officers of various ranks below that of cabinet level'") (first alteration in original) (quoting RESTATEMENT (SECOND) OF TORTS § 591 cmt. c (1977)).

[47] See Barr, 360 U.S. at 573 (department heads are more likely to be shielded by absolute privilege "because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion it entails").

[48] See Resp't's Br. at 11-12 (contending they had authority to "determine who will teach" within the Division of Pulmonary and Critical Care Medicine).

[49] CP at 7 (complaint alleging defamation occurred at a division faculty meeting to consider reappointments); CP at 80 (Section 24-53 of the Faculty Code explaining departmental faculty vote on reappointment of nontenure faculty).

of a statewide department requires freedom to discuss her employees to manage her department as she sees fit,[50] Glenny and Skerrett fail to show the "extraordinary breadth of an absolute privilege" is necessary to exercise their limited authority. Because the trial court relied upon Glenny and Skerrett possessing an absolute privilege to dismiss Davidson's suit, it erred.

Now we turn to the question of statutory immunity. The parties did not address RCW 28B.10.648(1) in their briefs, and we asked them to come to oral argument to discuss whether the immunity it grants is inconsistent with an absolute privilege for individuals who make written or oral statements in support of or against a person being reviewed for a higher education position. Glenny and Skerrett contend they qualify for the common law absolute privilege regardless of RCW 28B.10.648(1).[51]

Davidson agrees some form of privilege applies, but it is only a conditional statutory privilege conferred by RCW 28B.10.648(1). He contends dismissal on the pleadings was inappropriate because he alleged Glenny and Skerrett acted in bad faith.[52] The question is whether the statute applies here and, if so, whether Davidson alleged facts sufficient to survive a CR 12(c) motion for judgment on the pleadings.

---

[50] Stidham, 30 Wn. App. at 614-15.

[51] July 22, 2020 oral argument, 10:30-11:50, http://www.courts.wa.gov/content/OralArgAudio/a01/20200722/2.%20Davidson%20v.%20Glenny%20%20%20800621.mp3.

[52] Id. at 1:20-1:50, 3:20-4:30.

We interpret statutes to carry out the intent of the legislature.[53] We determine its intent by considering the text of the statute and related statutes.[54] If the plain meaning of the statute is clear, then we do not resort to tools of statutory construction, and we give effect to the statute's plain meaning as an expression of legislative intent.[55] Because statutory privileges are generally considered to be in derogation of the common law, they must be strictly construed.[56]

RCW 28B.10.648(1) confers immunity from civil suits upon all employees of "institutions of higher learning serving on peer review committees which recommend or decide on appointment [or] reappointment . . . for employees of the institution" so long as their performance on the committee was in good faith. The same provision also shields "[i]ndividuals who provide written or oral statements in support of or against a person reviewed . . . if their statements are made in good faith."[57] This conditional statutory immunity is like a qualified privilege.[58] By

---

[53] Magney v. Truc Pham, No. 96669-9, slip op. at 7 (Wash. July 2, 2020), http://www.courts.wa.gov/opinions/pdf/966699.pdf (quoting Swinomish Indian Tribal Cmty. v. Dep't of Ecology, 178 Wn.2d 571, 581, 311 P.3d 6 (2013)).

[54] Id. (quoting Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 11, 43 P.3d 4 (2002)).

[55] Id. (quoting Campbell & Gwinn, 146 Wn.2d at 9-10).

[56] Id. Neither party has argued Glenny and Skerrett's communications would be shielded by a qualified privilege under the common law. Thus, we assume, without deciding, that the conditional privilege granted by RCW 28B.10.648(1) is in derogation of the common law.

[57] RCW 28B.10.648(1).

[58] See McNamara v. Koehler, 5 Wn. App. 2d 708, 715, 429 P.3d 6 (2018) (explaining an absolute privilege shields a speaker from "all liability," whereas a qualified privilege can be lost if abused) (citing Bender, 99 Wn.2d at 600), review denied, 192 Wn.2d 1021, 433 P.3d 816 (2019); see also Bender, 99 Wn.2d at 601-02

conferring only a conditional immunity upon faculty in hiring committees, the legislature implicitly rejected the possibility of an absolute privilege for the same conduct.[59]  If Davidson was a statutory employee and Glenny and Skerrett were serving on a "peer review committee" to decide on his reappointment, then only the conditional immunity in this statute could apply.

Davidson worked at Harborview Medical Center as an unpaid volunteer clinical professor.  He worked one afternoon each week to see patients with fellows, residents, and medical students.  During his 14 years as a volunteer at Harborview, he supervised more than 4,000 patient visits.  Chapter 28B.10 RCW does not define "employee," but it was well-established when RCW 28B.10.648(1) was enacted that an unpaid volunteer could be a statutory employee.  "[W]here one volunteers or agrees to assist another, to do something for the other's benefit, or to submit himself to the control of the other . . . then the service may be rendered within the scope of [an employer-employee] relationship."[60]  Because

(qualified privilege is abused when the speaker acted with "knowledge or reckless disregard as to the falsity of a statement") (citing cases).

[59] Cf. Magney, slip op. at 8 ("In interpreting a statute we must keep in mind the interpretive canon expressio unis est exclusion alterius, i.e., '[w]here a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature.'") (quoting Wash. Nat. Gas Co. v. Pub. Util. Dist. No. 1 of Snohomish County, 77 Wn.2d 94, 98, 459 P.2d 633 (1969)).

[60] Baxter v. Morningside, Inc., 10 Wn. App. 893, 896-97, 521 P.2d 946 (1974); see LAWS OF 1984, ch. 137, § 1 (enacting RCW 28B.10.648); see also Fed. Home Loan Bank of Seattle v. Credit Suisse Sec. (USA) LLC, 194 Wn.2d 253, 289, 449 P.3d 1019 (2019) ("We presume that the legislature is aware of published appellate court decisions.").

Davidson provided benefits to UW with its consent and was subject to its regulations in the Faculty Code, we conclude he was a statutory employee for purposes of RCW 28B.10.648(1).

The statute also does not define the phrase "peer review committee" nor the individual words in that phrase. When a statute does not define a term, we can turn to a standard dictionary.[61] A "committee" is a group of "persons delegated to consider, investigate, or take action upon . . . some matter or business."[62] A "peer" is any person "belonging to the same group in society, especially when membership is determined by age, grade, or status."[63] And to "review" is "to go over with critical examination in order to discover excellences or defects."[64] Thus, in RCW 28B.10.648(1), a "peer review committee" is a group of persons belonging to the same group in society who are joined to consider another peer by critically examining that peer's excellences and defects.

---

[61] Cornu-Labat v. Hosp. Dist. No. 2 Grant County, 177 Wn.2d 221, 231, 298 P.3d 741 (2013) (quoting State v. Watson, 146 Wn.2d 947, 954, 51 P.3d 66 (2002)). We note that the Cornu-Labat court also relied on the dictionary to define the phrase "peer review committee" when interpreting an exception to the Public Records Act, RCW 42.56.360(1)(c). Id. at 230-33. To define the phrase, the court looked to the dictionary before relying upon RCW 7.71.030(1) and RCW 7.70.020 to determine whether a nonphysician could be part of a "peer review committee" under RCW 4.24.250. Id. Although both statutes use the phrase "peer review committee," RCW 28B.10.648(1) and RCW 4.24.250(1) address distinct situations, so we decline to rely on the court's interpretation of the latter to interpret the former.

[62] WEBSTER'S THIRD NEW INT'L DICTIONARY 458 (2002).

[63] WEBSTER'S THIRD NEW INT'L DICTIONARY 1665 (2002).

[64] WEBSTER'S THIRD NEW INT'L DICTIONARY 1944 (2002).

In September of 2016, faculty from the Division of Pulmonary and Critical Care Medicine "met to consider, among other issues, the reappointment of volunteer clinical appointments."[65] Section 24-53 of the Faculty Code explains the "voting members" at a nontenure reappointment meeting are "members of the appropriate department . . . who are superior in academic rank or title to the person under consideration."[66] Davidson alleged he was defamed when Glenny and Skerrett addressed a reappointment meeting and raised the allegations against him without explaining they were unfounded. Because Davidson alleged his peers—other physicians in his department—met to critically examine whether he deserved reappointment, he alleged Glenny and Skerrett defamed him during a "peer review committee" meeting covered by RCW 28B.10.648(1). And because the conditional immunity conferred by the statute applies equally to peer review committee members and anyone "who provide[s] written or oral statements . . . against a person reviewed,"[67] Glenny and Skerrett are statutorily immune from liability only if their statements were made in good faith.

A speaker abuses a qualified privilege or immunity when he knows his statements are false.[68] Davidson alleges Glenny and Skerrett "intentionally omitted key information" and "each knew" they were spreading false impressions

---

[65] CP at 7.

[66] CP at 80.

[67] RCW 28B.10.648(1).

[68] Lillig v. Becton-Dickinson, 105 Wn.2d 653, 658, 717 P.2d 1371 (1986) (citing Bender, 99 Wn.2d at 601).

when they spoke with the peer review committee.[69]  Because Davidson alleged Glenny and Skerrett did not act in good faith when speaking with the peer review committee, the conditional immunity conferred by RCW 28B.10.648(1) would not apply to them.

Therefore, we reverse.

WE CONCUR:

---

[69] CP at 2, 7.